**PUBLIC VERSION**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 1:16-cr-00640-BMC |
| - against - | ECF Case |
| MARK NORDLICHT, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................... 1

THE FACTS ............................................................................................................. 4

    1.    Misrepresentations Regarding Brady Material ..................................... 4

    2.    Misrepresentations Contained in the August 2017 Application to Chief Judge Irizarry.................................................................................................. 11

    3.    Misrepresentations Contained in the April 2018 Application to Your Honor........... 13

    4.    Misrepresentations Regarding Rule 16 Discovery .................................... 16

ARGUMENT ........................................................................................................... 20

I.    THE INDICTMENT SHOULD BE DISMISSED ................................................ 20

    A.    The Government Made Repeated Misrepresentations to the Court.......................... 22

    B.    The Government's Repeated Disregard for Court Orders. ........................................ 24

    C.    The Government Made Repeated False Representations to the Court and to the Defendants. ............................................................................................. 25

II.    ALTERNATIVELY, THE IMPROPERLY-CONCEALED WITNESSES AND MATERIALS SHOULD BE PRECLUDED.............................................................. 26

CONCLUSION......................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baba v. Japan Travel Bureau Int'l, Inc.*,
   111 F.3d 2 (2d Cir. 1997) ..........................................................................................24

*Berger v. United States*,
   295 U.S. 78 (1935)......................................................................................................22

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................................ *passim*

*Raimey v. Wright Nat'l Flood Ins. Co.*,
   303 F.R.D. 17 (E.D.N.Y. 2014) ..................................................................................24

*Rates Tech. Inc. v. Mediatrix Telcom, Inc.*,
   No. CV 05-2755(JS)(AKT),
   2008 U.S. Dist. LEXIS 120288 (E.D.N.Y. Mar. 31, 2008),
   *recommendation adopted by*
   2011 U.S. Dist. LEXIS 34941 (E.D.N.Y. Mar. 31, 2011) ........................................24

*Strickler v. Greene*,
   527 U.S. 263 (1999)....................................................................................................22

*United States v. Broward*,
   594 F.2d 345 (2d Cir. 1979)...................................................................................20, 21

*United States v. Chapman*,
   524 F.3d 1073 (9th Cir. 2008) ....................................................................................20

*United States v Cuervelo*,
   949 F.2d 559 (2d Cir. 1991)........................................................................................21

*United States v. Hasting*,
   461 U.S. 499 (1983)....................................................................................................27

*United States v. HSBC Bank USA, N.A.*,
   863 F.3d 125 (2d Cir. 2017).........................................................................................27

*United States v. Leslie*,
   759 F.2d 366 (5th Cir. 1985) ......................................................................................20

*United States v. Lyons*,
   352 F. Supp. 2d 1231 (M.D. Fla. 2004)......................................................................21

*United States v. Omni Int'l Corp.*,
   634 F. Supp. 1414 (D. Md. 1986) ...............................................................................20

**PUBLIC VERSION**

*United States v. Palmisano*,
　　No. 96-1142,
　　1996 U.S. App. LEXIS 30727 (2d Cir. Nov. 22, 1996)........................................21

*United States v. Payner*,
　　447 U.S. 727 (1980)........................................................................................20

*United States v. Schmidt*,
　　105 F.3d 82 (2d Cir. 1997)..............................................................................21

*United States v. Struckman*,
　　No. CR04-00229-RMT,
　　2007 WL 9701165 (W.D. Wash. Oct. 16, 2007) .............................................27

*United States v. Wang*,
　　No. 98 Cr. 199 (DAB),
　　1999 U.S. Dist. LEXIS 2913 (S.D.N.Y. Mar. 15, 1999) .................................21

*United States v. Wedra*,
　　343 F. Supp. 1183 (S.D.N.Y. 1972)................................................................27

*Urban Elec. Supply & Equip. Corp. v. New York Convention Ctr. Dev. Corp.*,
　　105 F.R.D. 92 (E.D.N.Y. 1985)......................................................................24

## RULES

Federal Rule of Civil Procedure 37(b)......................................................................24

Federal Rule of Criminal Procedure 16 ............................................................. *passim*

## INTRODUCTION

On December 14, 2016, the Government unsealed an eight-count Indictment, alleging that

seven individuals had defrauded investors in the Platinum Partners hedge funds ("Platinum" or the

"Funds") through misstatements and omissions related to the liquidity profile of the Funds and value

of certain of the Funds' assets, as well as investors in Black Elk Energy Offshore Operations ("Black

Elk") public bonds through misrepresentations and omissions related to the ownership of those

public bonds.  *See* Dkt. No. 1 (Indictment).  The Government's investigation into Platinum began, of

course, long before that.  By the time the Indictment was unsealed, the Government had collected

tens of millions of documents from Platinum employees, investors, service providers, and Platinum

itself.  Additionally, by December 14, 2016, the Government had completed dozens of interviews of

potential witnesses and alleged co-conspirators.

The Defendants each engaged counsel and the first pretrial conference was held on January

12, 2017.  At that conference, and at numerous subsequent conferences, the Government reported on

its compliance with Rule 16, as well as its full compliance with its obligations under *Brady v.*

*Maryland.*  Those reports generally followed the same pattern:  there were tens of millions of pages

of documents that the Government was producing to the defense and it was from those documents

that the defense would be able to discern the particulars relating to the charges in the Indictment;[1]

and that the Government had fully complied with its *Brady* obligations.  But those repeated

representations – made to the Defendants and two federal judges – proved false.  While the

Government told the Defendants in open court that the scope of remaining Rule 16 discovery was

---

[1] The defense had requested particulars from the Government in order to learn, among other things, which alleged statements of the defendants the Government was alleging were false, but the Government declined to provide any particulars and opposed the Defendants' motion for a bill of particulars based in part on its contention that the defense could glean that information from reviewing the tens of millions of pages of documents being produced.  *See* Dkt. No. 185.

"minimal" or mere "clean up" – representations that the Government knew the defense would rely upon in allocating its limited resources in attempting to review the overwhelming volume of material dumped upon it – the Government was secretly holding back critical evidence in the case:  hundreds of tape recordings, many involving the Defendants themselves, and hundreds of thousands of text messages and emails, many to and from the Defendants.  And while the Government sought to justify its misstatements about discovery on the basis of an *ex parte* Order entered by Chief Judge Irizarry, that Order only allowed the Government to delay the production of these critical materials, not misleadingly fail to disclose their existence altogether.

Moreover, we now know the Government's application to secure this Order contained false, misleading, and inaccurate statements.  Specifically, the Government represented to Chief Judge Irizarry that the Defendants posed a serious risk to the safety of cooperating witnesses and their families, but based on the record to date, the Government had no evidence whatsoever to support such safety concerns.[2]  The Government told Chief Judge Irizarry that the Defendants and the cooperating witnesses were all part of the same small Orthodox Jewish community, which was also inaccurate.  The Government also represented to Chief Judge Irizarry that all the cooperating witnesses had articulated the identical fear of "ostracism and harassment" because the Defendants and their communities were Jewish, and as such, would retaliate against the cooperators.  But the Government has come forward with no evidence supporting any such statements.  The Government then repeated these representations to Your Honor in a second *ex parte* application, this time seeking a delay in producing 3500 material from its cooperating witnesses.  Again, the Government made

---

[2] If the Government genuinely believed even a single one of the defendants posed a serious risk to the safety of any witness or a family member of such a witness, it surely would have moved to remand those defendants – but it did not. We submit that the Government's failure to act in this regard makes plain the Government harbored no true concern for the witness' safety.

**PUBLIC VERSION**

representations about the purported danger the Defendants posed to the cooperators because the Defendants and cooperators were all part of the same small Orthodox Jewish community – again, without any evidence to support the assertion that the Defendants posed a safety risk to the cooperating witnesses, and again, without a single note or memorandum reflecting that even one of these witnesses had expressed a concern of any kind.

Finally, while the Government repeatedly told the Defendants, Chief Judge Irizarry and Your Honor that there was no additional *Brady* material contained in any of the witness statements the Government had prepared in the course of the investigation, that too was untrue.  The witness statements are in fact replete with obvious exculpatory evidence that the Government had been ordered to turn over to the defense more than a year ago.  Indeed, it appears clear that the Government's representations to both the Court and the defense in this regard were not accurate and at odds with both the Orders of this Court and the Constitution.

The Government's conduct in this case has been shocking:  it has failed to meet the high standard that the Court and defense counsel expect from our prosecutors.  It has not been forthright with the defense, and it has not been forthright with the Court.  Particularly troubling are the Government's representations made in *ex parte* settings where no defense counsel can rebut the Government's factual assertions.  The result of what appears to have been a campaign of falsehoods secured for the Government strategic yet improper advantages by withholding from the defense critical evidence, including exculpatory material, and caused the defense to devote its limited resources and time to a quantum of evidence that the Government represented as complete – when in fact critical evidence was being concealed.

One of these events alone would have been alarming, for we all rely on prosecutors to comply in good faith with their legal obligations and representations to the Court.  But such repeated

misconduct on the part of this prosecution team over an 18-month period goes far beyond what can be countenanced as to require an immediate and severe sanction.  As Chief Judge Irizarry prophetically said:  "***Obviously, if the government is making misrepresentations to the Court, then there are consequences to that and we'll have to address them when the time comes.***"  Ex. 1 (Aug. 28, 2017 Conf. Tr.) at 30:25-31:2.  Respectfully, the time has come.

## THE FACTS[3]

1.  *Misrepresentations Regarding Brady Material*

The Government has a constitutional obligation to provide the defense with *Brady* material sufficiently in advance of trial to allow the defense to make effective use of that evidence. *Brady v. Maryland*, 373 U.S. 83 (1963).  As early as March 27, 2017, the Government assured the defense and Chief Judge Irizarry that, "[o]bviously, there is an obligation on us to make sure that any *Brady* that is there will be produced, and we will be producing any *Brady*.  In addition, we will be asking the SEC if they are aware of anything else that would qualify as *Brady*, to also let us know." Ex. 3 (Mar. 27, 2017 Conf. Tr.) at 19:9-13.  By the May 12, 2017 status conference, Chief Judge Irizarry, acting on the defense's frustration at the lack of *Brady* material disclosed, ordered the Government to review its files for *Brady* material by June 30, 2017:

> MS. COOLEY:   Your Honor, as I've mentioned to Mr. Fodeman, we are very aware our obligations, we will comply with them. I don't know that we can provide a time frame for any potential disclosures in the case but I will say that ***we will comply with our obligations in a timely manner to the extent we encounter materials***.
>
> THE COURT:  Well, ***timely means sooner rather than later***.
>
> MS. COOLEY:  Yes, Your Honor.

---

[3] As requested by the Court, this Memorandum includes a detailed factual background.  *See* Ex. 2 (Oct. 29, 2018 Conf. Tr.) at 54-55.  To the extent that the Government disputes any of these facts, or any other factual assertions contained herein, we reiterate our request for a hearing to determine the basis for the Government's factual assertions that differ from those made previously to the Court and to the defendants.

THE COURT:  *Not five months from now*.

MS. COOLEY:  Correct, Your Honor. *We absolutely will not wait many months*.

THE COURT:  I understand that the discovery is voluminous but you do have a team of prosecutors and you need to make this a priority so that the Defendants have enough time to follow any leads if there are any.

MS. COOLEY:  Yes, Your Honor.

THE COURT:  If there are any. If there isn't, then at least you should be able to report. So, I'm going to put a time frame on it and I would expect that by June 30th I want a letter from the government indicating that they've conducted their review and either you found nothing or you found something or whatever the case may be but there should be some sort of a status report.

MR. FODEMAN:  Thank you, Judge.

MS. COOLEY:  Yes, Your Honor.

THE COURT:  And I would think, you know, you've got case agents, they shouldn't be let off the hook. I didn't let my case agents off the hook when I was a prosecutor. They've got to sit there and help you out with this stuff. They sat there and interviewed witnesses and they have a sense of what's inculpatory, not exculpatory, at least they can point you in the right direction. Okay.

Ex. 4 (May 12, 2017 Conf. Tr.) at 18:17-19:24 (emphasis added).[4]

On June 30, 2017, the Government made its report in connection with Chief Judge Irizarry's

Order, and assured Judge Irizarry that it had "engaged in a review of reports of interviews generated

in the government's investigation," and had also "reviewed the [SEC's] documentation of

interviews." Dkt. No. 164.  The Government reported that there was no additional *Brady.  Id.*

In light of the suspiciously paltry disclosures made by the Government pursuant to Chief

Judge Irizarry's Order, the defense wrote to the Government with a series of specific items outlining

the categories of information to which they were entitled.  *See* Dkt. No. 166.  The Defendants

---

[4] In June 2017, the Government did make limited *Brady* disclosures to the defendants, identifying ▮▮▮▮▮▮▮, and (a PPVA investor), ▮▮▮▮▮▮▮ (a partner in Platinum), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and Stephen Lieberman who did work related to Platinum portfolio company, Golden Gate Oil, as individuals who "may have information helpful to the defense."  *See* Ex. 5 (June 15, 2017 Letter from B. Rohde); Ex. 6 (June 23, 2017 Letter from B. Rohde); Ex. 7 (June 30, 2017 Letter from B. Rohde).  We now know that the Government was in possession of this *Brady* material *prior* to the issuance of the Indictment and elected to withhold it for over six months.

provided this information to the Government, knowing that they were revealing many of their

potential defenses, but taking a calculated risk in light of the potential exculpatory information that

would be provided for them to investigate.

Chief Judge Irizarry was similarly concerned by the Government's minimal *Brady*

disclosures pursuant to her Order. At the July 7, 2017 status conference she further directed the

Government as follows:

> THE COURT:  Let me cut to the chase. Let's cut to the chase. I get the idea. You've got 13.5 million documents produced thus far, with more to come. There were lots of interviews that were conducted, pre-indictment, pre-filing of the civil matter, lots of interviews that apparently occurred over the course of a number of years. ***The concern is that the government is either not doing the due diligence necessary to uncover those documents, whichever way it's being searched. I don't know how it's being searched. Or that the government is intentionally withholding Brady information. Either way, it does seem rather odd or unusual that given the volume of documents that -- and given even some of the letters that the Court has received gratuitously from -- we'll just call them interested parties for now, where from their perspective, there was no wrongdoing and, potentially, represents exculpatory information for the defense to follow-up. So I also expect that no later than August 4th, if not before that, that the government conduct a further review***. I don't care how you do it, whether you do it with your prosecutors, or whether you do it with your agents . . .

Ex. 8 (July 7, 2017 Conf. Tr.) at 26:12-27:6 (emphasis added).

> MS. COOLEY:  I just want to correct some misimpressions I think that were left by Mr. Fodeman's discussion just now. I'd first like to just clarify what we have done and what we were directed to do by last Friday. ***We have done a very thorough and good faith review of reports of witness interviews. We have reviewed the SEC file that we discussed in our letter. We made three separate disclosures of four individual witnesses' statements to the defense***, and that's why we're having this conversation; because the defense has that material, and the defense has those disclosures, and that's what Mr. Fodeman is discussing. So they're in possession of that information. We provided it to them, and we made those disclosures after that good faith review. We did not certify, and we were not directed to certify by last Friday, that we have reviewed every page of discovery in this voluminous case and certify there was nothing else to disclose. We are aware of our ongoing obligations, and to the extent that we uncover additional material, we will promptly turn it over, and that's what we've been doing diligently since the last court appearance.

> THE COURT:  In the first place, let me stop you right there. Let me stop you right there, because ***Brady doesn't say that the government has to start looking at their evidence for any potentially exculpatory information, or any Giglio information, when the defendant asks for it or when directed by the Court to look for it. You have an ongoing obligation from the time you bring the case. This case was brought in December of last year. We're seven months into the case. And so what I hear you saying is that you've started to look for Brady since our last appearance***

-6-

> *here and since directed by the Court to provide a certification as to what you have found in your search for Brady. That falls far short of your obligation. Your obligation is ongoing.*
>
> MS. COOLEY:  Yes.
>
> THE COURT:  *It's ongoing, and it's ongoing from the point that you bring an accusation against a defendant. And you have an obligation as you are investigating to make sure that you make note of any evidence that is potentially exculpatory, because I would think as an investigative prosecutor you need to take that into account in determining what charging decisions to make.* I was an investigative prosecutor, and we certainly took all of that into account.
>
> MS. COOLEY:  Yes, Your Honor. We understand that, and *we are not waiting for the Court's order or the request of the defendants to produce Brady.*
>
> THE COURT:  *Well, it sounds like that's exactly what you did.*
>
> MS. COOLEY:  Your Honor, there are voluminous materials, as your Honor is aware, and there were several witness interviews done, several which the prosecutors were not present for, and we have to go back to those materials and make sure we have reviewed them diligently, and that's what we have attempted to do most recently --
>
> THE COURT:  Again, "most recently." You're not looking at them as you're going along.
>
> MS. COOLEY:  We have, for a good portion.
>
> THE COURT:  You have agents to work on that. *You need to give them direction and not just blindly producing stuff as it's going along.*

*Id.* at 30:16-34:12 (emphasis added).  Chief Judge Irizarry also Ordered the Government to respond individually to each of the categories of *Brady* material identified by the Defendants by July 28, 2017.  *Id.* at 33:3-22.

On July 28, 2017, the Government responded to the categories of *Brady* material outlined by the Defendants and indicated that there was no additional *Brady* material to be disclosed.  *See* Dkt. No. 185.  In light of the Government's continued insistence that it had reviewed all of the materials available to it and there existed no additional *Brady* material, the Defendants were forced to raise the issue again at the August 28, 2017 status conference:

> MS. COOLEY:  Thank you, Your Honor. We did respond in detail to each of the requests. We did a fact specific inquiry as to each of the many requests not just Mr. Levy's original 44 requests but the many additional requests by each other defendant and we provided those responses in our

-7-

July 28th submission. Mr. Fodeman referenced how we described certain Rule 16 productions we had made. We noted that in our response, Your Honor, because, as we argue in our response, we don't agree with Mr. Fodeman or with defense counsel for the other defendants that each of the items they've requested is subject to disclosure under Brady. We do fundamentally disagree on several requests, but what we have done is we provided them with all the materials we received from the SEC exam team so we provided those to them. That was one of the items they requested. We don't concede that those materials are categorically subject to disclosure under Brady but we reference that we have produced them to defense. The same thing goes for the Baker Hostetler production, which I mentioned earlier. There are several references to communications with counsel in the defendants request for disclosures. Again, without conceding that those documents or those communications are subject to disclosure, we have produced all of the materials we received from Baker Hostetler to the defense in Rule 16 production. So we mentioned that by way of a response to some of the defendants' specific requests. *We are reviewing all of the evidence in our possession to the best of our ability, Your Honor. We are running targeted searches in the millions of pages of documents. We are in constant communication with our agents and have definitely impressed upon them the importance of this and their need to bring to our attention additional information that they may be more privy to. We've had multiple conversations with them about that since the beginning of this case and renewed conversations since the last status conference. So, Your Honor, we have done our best to be responsive to each of the requests the defendants have made and we don't agree with the defenses' representations that we have withheld Brady material or that each of the items they requested constitute Brady material.*

Ex. 1 (Aug. 28, 2017 Conf. Tr.) at 23:3-24:19 (emphasis added).

MR. FODEMAN:  . . . But what we certainly don't have, Judge, is their interview memos and to the extent that they contain Brady we have no way of finding that. And I'm not asking for the memos right now, but my question that I'd ask Your Honor to put to the government is --

THE COURT:  Well, a lot of the requests in fact are for identity of witnesses and statements of witnesses which you are not entitled to at this point in time.

MR. FODEMAN:  But, Your Honor, if it's Brady –

THE COURT:  *I would assume that those documents, has the government reviewed those kinds of documents?*

MR. FODEMAN:  That's my question. Thank you.

MS. COOLEY:  *Yes, Your Honor.*

THE COURT:  Then they have, so there you go.

MR. FODEMAN:  *Since we've identified the areas, the 44 questions, since that's come out since the defendants have all expressed what they view as Brady, those memos have been reviewed and those 302s have been looked and we won't see any Brady when we finally get them produced in 3500 material.*

MS. COOLEY:  Your Honor, we have put in detail in our response, our responses to each of the requests and that includes our responses having looked at the relevant witness interviews. However, I will note, as we've stated in our papers, that we do not agree with the defendants' characterization of certain of the requested items as Brady, and so that's what's being debated as we speak. ***However, we have engaged in that review.*** And, Your Honor, I'll also note that the practice in our unit, in the business and securities fraud unit in our office, is to provide to the defense at the time of 3500 disclosures every witness interview that was generated in connection with our investigation. So they will receive all of those reports and all of those notes whether or not we will be calling all of those people as witnesses. All of that will be provided to the defense at the time of 3500. ***Obviously, to the extent that we uncover anything amounting to Brady from witness interviews, we will provide that before then.*** I wanted Your Honor to know that's our practice in this unit that they will receive all those reports and notes.

*Id*. at 27:18-29:7 (emphasis added).

MR. LEVINE:  Again, Seth Levine for Mr. Small. You know, Your Honor, this issue about making sure that we have Brady in white collar cases is so difficult, because unlike other matters that turn on physical events and happenings where, you know, you either have a picture or you have a weapon or have something where it's very tangible, here all these cases are just about intent and, therefore, sussing out what exactly might be Brady from the defenses' perspective is difficult for the government to do even when, and as I think they're doing here, acting in good faith. But I will note, Your Honor, that in order to avoid the kind of situations that Mr. Fodeman has talked about either just before trial or even worse after, and we have to make assessments on whether information would have made a difference, there has been a practice in many white collar cases, two of which I'm involved in, that the government to avoid this problem of having to have the defense guess what they might have to ask for it specifically enough to get it, has just produced the 3500 material at the beginning of the case on the grounds that it takes away this problem which always occurs.

. . .

THE COURT:  They are not going to do that, they said that they're not going to do that. There are some concerns here that have been raised already concerning security of witnesses. The government doesn't have to produce 3500 material and to the extent that that's really that's what you're all pushing for rather aggressively, I might add, you're not entitled to that. And you've gotten -- you will, at least by the time the government is done, gotten 14.8 million pages of discovery. And after much ado and much fighting in the civil matter, ultimately you wind up getting everything in the SEC case anyway with the exception of testimonial deposition and things of that nature, that kind of discovery. So you do have the ability to search those documents as well. I'm not going to sit here and look through 14.8 million documents. ***<u>Obviously, if the government is making misrepresentations to the Court, then there are consequences to that and we'll have to address them when the time comes.</u>*** So the government is aware of their obligation, they've addressed each of the points, as I said, I'll go through it all carefully. To the extent that I have some concerns or some questions and it's not overly burdensome, then maybe some things need to be looked at in camera.

*Id*. at 29:11-31:7 (emphasis added).

This case was then reassigned to Your Honor on October 16, 2017.  On October 24, 2018,

the Government, pursuant to Your Honor's Order, produced witness statements from 122 witnesses.

The defense got to work on reviewing those statements and appeared at a pretrial conference on

October 29, 2018.  At that conference, the Defendants identified for the Court examples of obvious

*Brady* in the 3500 material that had been in existence when the Government gave its repeated,

Court-ordered assurances, both to the defense and the Court, that all *Brady* material had been

disclosed.  Because the defense had just begun its review of the 3500 material, those examples were

limited just to a few, although glaring, examples:

- A cooperating witness stated, in an interview with the Government predating the Indictment, that the cooperator would say that Platinum took the price of oil into account when conducting their valuations—a statement that directly contradicts paragraph 50 of the Indictment, which alleges that Platinum failed to take falling oil prices into account for its oil and gas portfolio companies.  Ex. 9 (███████████████████████████████ ███████).

- Another cooperating witness stated, in an interview with the Government predating the Indictment, that the cooperator knew that Platinum engaged a third party valuation group and an auditor, so "it wasn't like [Mr. Nordlicht] was making valuations up"—a statement that directly contradicts repeated allegations in the Indictment that Platinum fraudulently overvalued level 3 assets.  Ex. 10 ██████████████████████ ██████████.

- Another witness who was interviewed pre-Indictment told the Government that the witness believed that the PPNE note was permissible per the terms of the PPVA and PPCO private placement memorandums—a statement that directly contradicts the allegations in the Indictment that the PPNE note was used to improperly borrow money from one fund to pay redemptions in another.  Ex. 11 ███████████████████- ████████████████.

- The ██████████████████████████████████, told the Government in a pre-Indictment interview that Mr. Nordlicht did not have the final say at Beechwood with respect to how it would vote its Black Elk bonds in the consent solicitation—a statement that directly contradicts the Government's allegations that Platinum controlled Beechwood, and therefore Beechwood was not entitled to vote its Black Elk bonds in the consent.  Ex. 9 █████████████████████████████ ████.

-10-

- The corporate lawyer who had been hired by Black Elk for purposes of the consent solicitation had informed the Government that he did not even count the bonds voted by Platinum—a statement that directly contradicts the Government's allegation that Platinum somehow rigged the vote by submitting votes for its bonds.  Ex. 12 (3500 Material of Rob Shearer) at 3500-RSH-1 at 9-10.

Additionally, each example of undisclosed *Brady* material listed above is responsive to specific requests in Defendants' motion for a bill of particulars, *see, e.g.*, Dkt. No. 166 at 4-5, Request Nos. 7, 12, 14, 15, 17, so while that motion was denied, the Government was certainly on notice of what the defense had identified as *Brady*.

Since that conference, the defense has continued to review the voluminous 3500 material. The exculpatory evidence contained in the 3500 material we have been able to review to date dwarfs the list identified by the defense at the October 29 conference.  Indeed, the extent of the *Brady* we have been able to identify to date makes it absolutely clear that the Government could not have somehow missed these items when it represented to the defense and Chief Judge Irizarry that there was no such evidence.

In order to apprise the Court of the full scope of the *Brady* material the defense has identified to date from the 3500 material, and so as not to compromise our defense strategy,  the defense requests the opportunity to be heard *ex parte* so that we can detail for the Court the full scope of what is contained in the 3500 material we have reviewed to date, and thereby allow the Court to assess the Government's inexplicable representations that it had reviewed every one of these witness statements and that they were devoid of any *Brady*.

## 2.    *Misrepresentations Contained in the August 2017 Application to Chief Judge Irizarry*

On August 25, 2017, the Government made a sealed *ex parte* application to Chief Judge Irizarry to defer the production of several hundred thousand pages of material until 90 days before trial.  *See* Dkt. No. 206.  This application was premised on the Government's representations

regarding the compelling need to "protect the safety of witnesses" and "properly reduce the risk of jeopardizing the security of the cooperating witnesses[.]"  *Id*. at 2.  The Government argued that the production of the materials would "signal these witnesses' cooperation with the government" and a protective order was warranted because the revelation of their cooperation would "pos[e] significant risks to the safety of the witnesses and their families[.]" *Id.* at 6.  The Government advised Chief Judge Irizarry that the risk to the witnesses' safety was so great that, "the government intends to coordinate closely with the witnesses, their families and law enforcement authorities to address the risks posed by such disclosure to the witnesses and their families." *Id.* at n.4.  The Government further represented to Chief Judge Irizarry that these witnesses were all "member[s] of a small Orthodox Jewish community" and that each of the witnesses and their counsel had "advised the government" that they would be "subject to ostracism and harassment if [their] cooperation were revealed." *Id.* at 4.  Chief Judge Irizarry signed the *ex parte* protective order on August 28, 2017. *See* Dkt. No. 207.

The Government's representations to Chief Judge Irizarry to secure the Order were not grounded in evidence.  Specifically, despite the fearmongering in its application, the Government has provided no record to support that there was any threat to the safety of any of the cooperating witnesses.  The Government has similarly provided no evidence in support of its representations that its cooperating witnesses expressed acute fears of ostracism and harassment because these witnesses and the alleged conspirators were all members of the same small Orthodox Jewish community. The Government has not produced a single witness statement or note confirming that any such fear was expressed, *see* ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████; Dkt. No. 423, likely because the cooperating witnesses and the Defendants are NOT in fact members of the same

-12-

community.[5]  The Government also understood, having provided the defense with the identities of

the unindicted co-conspirators on January 19, 2017, there was little if any chance that the Defendants

were not already aware of the identities of the cooperating witnesses – which the Government failed

to explain to Judge Irizarry and which would have obviated the need for the protective order

altogether.  Additionally, we understand that much of the material withheld from the Defendants was

produced by subpoenas issued around the time of the search conducted on the Platinum offices or

issued by the SEC as a part of its investigation.  The issuance of such subpoenas was known to each

of the Defendants and their counsel as well as every other executive at Platinum, and would not have

revealed any witnesses' cooperation, especially since the production of much of this material was

compelled.  The Government's assertions regarding how the production of the materials would

"reveal" the identities of its witnesses were again baseless, and the Government failed to mention to

Chief Judge Irizarry that in the eight months during which the Defendants had known those

identities, not one of the cooperating witnesses had suffered the slightest harm to their safety, that of

their families, or any kind of "ostracism or harassment."

3.      ***Misrepresentations Contained in the April 2018 Application to Your Honor***

At this Court's direction, the Government filed a subsequent application on April 2, 2018 to

delay its disclosure of the 3500 material of "sensitive" witnesses until 30 days prior to trial.  *See* Dkt.

No. 325.  In that application, the Government represented to Your Honor that all of the cooperating

witnesses, the Defendants, and the unindicted coconspirators listed in the Indictment "maintain

religious and in some cases, familial bonds with one another, and their spouses and children are

members of the same community."  *Id*. at 2.  The Government also asserted that *each* of the four

---

[5] To extent that the Government continues to insist that such evidence does exist, we reiterate our request for a hearing.

PUBLIC VERSION

cooperating witnesses specifically "attested to the fervent intolerance of cooperation with the government exhibit by their tightly-knit religious community, and their well-founded concern that they and/or their families will experience threats and retaliation if their cooperation against the defendants in this case becomes publicly known." *Id.* at 5.  The Government represented that "cooperating witnesses . . . have expressed their individual concern as to the security for themselves and their families in the context of their small religious community . . . [they] have expressed that this religious community strongly disapproves of cooperating with law enforcement as to fellow members . . . similarly [another cooperating witness] has also expressed concern for his family's personal safety." *Id.* at 3.  As with the August 2017 application to Judge Irizarry, these representations to Your Honor were again unsupported by any factual record.  The Government lacked any basis to claim that the cooperating witnesses and the Defendants were members of the same religious community (and, in fact, they are not). █████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████ Dkt. No. 423.  And the Government has now conceded that there is no documentary record to support that even one of these witnesses ever "attested" to the intolerance of that religious community.  *Id.*  Contrary to the representations made to Your Honor, there is no record that *any* of those witnesses, let alone *all* of them, expressed a concern for their physical security or personal safety.  *Id.*  In short, the entire application to Your Honor was devoid of evidence supporting the assertions made therein.

At the October 29, 2018 Status Conference, and in several letters leading up to that conference, the Defendants raised significant concerns about the conduct of the prosecution team.  First, the defense alerted the Court to the Government's behavior and the representations made in

August 2017, noting that there were no such statements contained in the 3500 material.  The

following exchange then ensued:

> MR. LEVINE:  With all respect, Your Honor, if the Government's application says that witnesses and their lawyers told us things --
>
> THE COURT:  Right.
>
> MR. LEVINE:  Okay, so that means that they have statements. So if they have them, you don't need me to draw any inferences for you, just turn them over.
>
> THE COURT:  *It is a very valid point, but what it means is you show me in a motion that those statements were made in the application and you have received nothing on those; that may present nothing but a legal issue as to whether the application was defective*.
>
> MR. LEVINE:  I understand that, Your Honor, but why don't we just get to it? If the Government has such statements, we are entitled to them anyway because these are cooperating witnesses. They should have been produced under 3500. If they exist, give them to us right now. Why are we engaging in --
>
> THE COURT:  Let me inquire of the Government.
>
> MR. LEVINE:  Thank you, Your Honor.
>
> THE COURT:  The backup for the statements made in the ex parte application, I understand this was not the prosecutors making an evaluation and I think the thing about religious animus is way out of context just in the likelihood of what happened here. This is not the prosecutors saying on their own oh, this is a problem community. I don't see that. I see, it's more plausible to me, that cooperating witnesses came to the prosecutors, gave them descriptions and the prosecutors found those fears expressed by these witnesses to be plausible, rightly or wrongly. *Notwithstanding that, assuming that's the case, the fears have to be written down someplace. The general statement in the affidavit, the near certainty of a safety issue, that has got to be supported by something in writing somewhere, something that these witnesses said. Right?*
>
> MS. COOLEY:  Your Honor, *not every statement is memorialized or documented in a 302* in an agent's report, and so we have given them every report and supporting notes that we have for these witnesses. We are happy to confirm that today, but, you know, *I think that it's possible that there are conversations that were not in an agent's 302* --
>
> THE COURT:  *But that is troublesome; is it not? Because if you are then going to characterize those unrecorded conversations, and present them as the basis for an ex parte order, and there is no record by what they could have -- where Judge Irizarry could have gone to check them.* If she said, where is this? What does this mean? And you said, well, we have no written records; right, it's a problem.
>
> MS. COOLEY:  Your Honor, I think that we would submit the relevant information, if that were the case, by proffer and if there were conversations made with an attorney for a witness, that would not necessarily be documented in the same way, and so I think we would have to look at this again to be sure –

-15-

> THE COURT:  I'm going to ask you to look at it again, and if there is anything you haven't produced, produce it; because it does seem to me that, when you make those kinds of representations in an ex parte affidavit, it is unusual not to have written backup. It's not legally mandated, but it would certainly be good practice to say we're going to the judge, expressing our conclusions based on what we have heard, we should have a record someplace of what we've heard. And if that didn't happen, that is, at the very least not best practices, let me put it that way, and it may be more than that. So go back today, find out if there's anything else to back that stuff up. If there's nothing else to back it up, then you've got your motion and I will decide it, but I'm not going to decide it on an oral application raised here in court.

Ex. 2 (Oct. 29, 2018 Conf. Tr.) at 60:2-62:20 (emphasis added).

On October 30, 2018, the Government informed the Court that there was in fact no record of statements regarding the purported safety concerns of the cooperating witnesses.  Dkt. No. 423 at 1.

**4.** *Misrepresentations Regarding Rule 16 Discovery*

For the past two years, the Defendants have worked tirelessly to wade through the tens of millions of pages the Government produced in Rule 16 discovery.  The Defendants planned their review strategies to maximize the insurance coverage which provided for the Defendants' legal expenses based on the Government's representations about the status and scope of discovery.[6]  As early as May 12, 2017, the Government represented to Chief Judge Irizarry and the Defendants that they hoped to finish Rule 16 productions in July 2017.  *See* Ex. 4 (May 12, 2017 Conf. Tr.) at 7-8. On that same date the Government represented that the "vast majority of [discovery]" had been produced, when in fact *less than half* of the Rule 16 discovery had been produced.  *Id*. at 4-5.

On August 25, 2017, Chief Judge Irizarry granted the Government's sealed, *ex parte* application for a protective order for materials produced by four cooperating witnesses.  Dkt. No. 207.  That Order allowed the Government to defer the production of certain materials until 90 days

---

[6] Defendants also relied on the fact that they were entitled to advancement of their legal fees from Platinum once the insurance proceeds were exhausted, but the Receiver has now balked at that obligation and the issue of Platinum's advancement obligation is before the Court for determination.

prior to jury selection.  *Id.*  That Order also stated that the application and Order would remain under seal pending further action by the Court.  *Id*.

Over a year ago, on October 17, 2017, and with full knowledge of the substantial "deferred production," the Government represented to Your Honor and the Defendants that it had produced almost everything in its possession and only minor, clean up discovery remained to be produced:

> MS. COOLEY:  Yes, Your Honor. I think at the last status conference we projected that there was an additional batch of discovery to be produced. We have produced that batch. In fact, since the last status conference, we have produced an additional over 2 million pages of discovery, primarily production from various entities and individuals, including 10 specific individuals. So we have made enormous progress. I will say that to the extent that we are receiving additional materials as part of our investigation or in response to trial subpoenas, for example, we will have to produce those on a rolling basis. ***But the vast majority of everything that has been in our possession or that we received prior to today has been produced to the defense.***
>
> THE COURT:  ***You are saying subject to the usual cleanup routine that the Government has to go through as the case progresses, you pretty much produced everything?***
>
> MS. COOLEY:  ***That's right, Your Honor, with some very limited exception of things we are receiving on an ongoing basis that we have not yet had time to produce.***
>
> THE COURT:  ***There is not going to be another million pages turned over?***
>
> MS. COOLEY:  ***We don't expect there to be, Your Honor, no.***

Ex. 15 (Oct. 17, 2017 Conf. Tr.) at 17:4-18:1.

Again on November 27, 2017, the Government represented that "there will be no additional non-privileged productions [from the search of Platinum's offices]" and that only minimal, third-party productions remaining to be produced, "we occasionally will be receiving additional non-voluminous productions from third parties or in response to trial subpoenas."  Ex. 16 (Nov. 27, 2018 Conf. Tr.) at 5:8-6:5. The Government continued to assure the Court and the Defendants that there were only small, third-party productions remaining, never alerting the Defendants to the volume of materials being knowingly withheld:  "we have one production -- additional production from the SEC that we should be getting in the next few weeks that we'll be turning over to the defense, and

we have a few additional very small third party productions that we received in recent weeks that we will be disclosing as well. . . .  But we're well underway, and there's a very small volume of things we'll produce in the next several weeks." Ex. 17 (Apr. 9, 2018 Conf. Tr.) at 31:21-32:15.

In June 2018 – again with full knowledge that they were withholding substantial, voluminous, and highly relevant materials from the Defendants – the Government assured the Defendants that they were "up to date" with discovery, and the only items remaining to be produced were items the Government did not yet have in its possession:  "we are up to date with discovery in this case.  As I advised defense counsel prior to the conference, the substantial production that we just sent out last night we only received on Monday.  Parties are continuing to send us supplemental materials.  As soon as we get them, we turn them out.  But I don't think the parties would like it if we did not disclose supplemental material we received, and we're not going to tell everyone, you know, stop sending us any." Ex. 18 (June 29, 2018 Conf. Tr.) at 12:13-13:21.  And while being admonished by the Court for delaying discovery, the Government assured the Court and the Defendants that there would be no further significant productions:

> THE COURT:  Okay, what I'm going to do is tell you to take all reasonable action to close out discovery and get those parties to produce. You know, if they don't produce pursuant to a subpoena, you have to come to me and say we need help. We can't just delay the defendants on that. So I'm not going to set a hard and fast date because there always will be a dribbling process, probably right up to the date of the trial, but ***I don't expect any more 120,000-document productions to occur in the case at this stage.***
>
> MS. ELBERT:  ***Neither do we, Your Honor.***

*Id*. at 13:11-21.  And even *two weeks* before making the deferred production to Defendants, the Government continued to state in open court that the only remaining productions were those the Government was continuing to receive from third-parties:

> MS. COOLEY:  ***Your Honor, there will be some minimal productions left to be made***. I think that my understanding is one of them is from the SEC, essentially the SEC obtained more materials sent them to us and as part of the stay order, we will be producing them in discovery.

We don't intend to rely on them at trial. There are some other discrete productions. There are some very limited bank records. Black Elk bond records that were produced pursuant to trial subpoenas that we will turn over very promptly we expected neck week if not next week then the week after. We were informed by our vendor they did one final sweep of the database. There are 33 e-mails that were identified. I think there had been an understanding were duplicates. They were determined not to be duplicates we will produce them immediately. Other than that, to the extent we received any additional materials from the SEC or some kind of supplemental production response to a prior request we will produce that as soon as we receive it.

> <u>THE COURT</u>:   Okay. ***Sounds like the usual pretrial cleanup of outstanding items. Nothing significant.*** Okay.

Ex. 19 (Sept. 21, 2018 Conf. Tr.) at 17:14-18:10.

In light of these representations to the Court and to the Defendants, the defense was shocked when on October 5, 2018 at 11 P.M., they received an email from the Government indicating close to 300,000 pages of material from key witnesses as well as numerous recordings had been withheld from them. *See* Dkt. No. 400.  This significant production included the Defendants' own statements and the only consensual recordings in this case, including recordings of the Defendants themselves. *Id*.  Additionally, and contrary to Chief Judge Irizarry's August 2017 Order, this material was not made available to the defense on October 5, but instead could not even be ordered from the Government's vendor until October 8. *See id*. at 5.  In response to defense concerns that the Government had repeatedly misled the defense about the scope of Rule 16 discovery, the Government responded that the August 2017 Order did not allow them to even mention the existence of the deferred production. *See* Ex. 2 (Oct. 29, 2018 Conf. Tr.) at 45; Dkt. No 411 at 1-2.  But that position is obviously baseless.  The Order provided for only two things:  (1) it allowed the Government to defer the production of certain material and (2) to keep the Order and accompanying application under seal. *See* Dkt. No. 207. The Order did not authorize the Government to misrepresent the status or scope of discovery. *Id*.

-19-

Nor did such falsehoods protect the safety of the witnesses over whom the Government professed such concern.

## ARGUMENT

## I.    THE INDICTMENT SHOULD BE DISMISSED

Repeated instances of intentional and egregious misconduct justify the dismissal of an indictment.  *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979).  This Court possesses the supervisory power not only to vindicate the Defendants' rights in the instant case, but also to preserve and protect the integrity of the judicial system.  *United States v. Leslie*, 759 F.2d 366, 372 (5th Cir. 1985); *see United States v. Chapman*, 524 F.3d 1073, 1084-85 (9th Cir. 2008) (exercising the court's supervisory power and dismissing indictment due to Government's discovery violation and repeated misrepresentations to the court as to their compliance).  Where the Government engages in such misconduct, the Court is entitled to exercise its supervisory power to prevent the federal courts "from becoming accomplices to such misconduct."  *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438 (D. Md. 1986) (citing *United States v. Payner*, 447 U.S. 727, 744 (1980) (Marshall, J., dissenting)).  As set forth above, there can be little doubt that the Government has engaged in repeated instances of deliberate misconduct that has prejudiced this matter and jeopardized the integrity of the judicial system.  **First**, the Government made assertions to the Court on at least two occasions that had no factual bases.  **Second**, the Government repeatedly failed to abide by Court orders directing it to fulfill its constitutional obligations.  **Third**, the Government made repeated false representations to the Court and to the Defendants.  One of these events alone would have been disturbing, but such repeated conduct on the part of this prosecution team over an 18-month period requires an immediate and severe sanction.

In light of such pervasive misconduct, not only should this Indictment be dismissed under the supervisory powers doctrine, it should also be dismissed under the Due Process Clause of Fifth Amendment.  *See*, *e.g.*, *United States v. Wang*, No. 98 Cr. 199 (DAB), 1999 U.S. Dist. LEXIS 2913, at \*109 (S.D.N.Y. Mar. 15, 1999) (finding a due process violation and dismissing an indictment in part due to the government's failure to provide defense counsel with "material information" until the "eve of trial"); *United States v. Lyons*, 352 F. Supp. 2d 1231, 1251-52 (M.D. Fla. 2004) (finding a due process violation, dismissing the remaining counts of the indictment, and refusing to order a new trial because of the government's multiple and flagrant *Brady* and *Giglio* violations). "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (internal citations omitted).  The remedy for such misconduct is typically dismissal of the indictment.  *See United States v Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991).  Though dismissal of an indictment is an extreme remedy that is only available in limited circumstances, the Second Circuit has stated that dismissal is warranted for outrageous government conduct where it is necessary "to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct." *Broward*, 594 F.2d at 351.  *See United States v. Palmisano*, No. 96-1142, 1996 U.S. App. LEXIS 30727, at \*6 (2d Cir. Nov. 22, 1996) (dismissal of an indictment is "an extreme sanction" that is "only justified in order to:  (1) eliminate prejudice in a criminal prosecution, or (2) correct a pattern of prosecutorial misconduct.") (internal citation omitted).

Prosecutors play a venerated role in our justice system, and out of necessity, courts and defendants must rely on the Government to fulfill its responsibilities with integrity.  In light of its

special role, the Government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)(citations omitted)).  The Government has not abided by its duties and obligations in this case, and has instead has pursued strategic advantage over fundamental fairness. The Court and the Defendants can no longer be expected to have confidence in the Government's conduct in this case.  The Indictment should thus be dismissed under the Court's supervisory powers and the Due Process Clause of the Fifth Amendment.

### A.     The Government Made Repeated Misrepresentations to the Court.

The Government made representations to Chief Judge Irizarry on August 25, 2017, and to Your Honor on April 2, 2018, that were not supported by any factual record.  Each application was rife with unsubstantiated statements that, rather than seeking to protect witness safety, was intended to gain an improper strategic advantage for the Government by delaying the disclosure of keenly relevant materials to the defense until much closer to trial.[7]  As described above, the Government had no record to support its assertions to the Court, including that:

(1) each of the cooperating witnesses had specifically articulated the extreme intolerance that their small, insular religious community harbored towards cooperation, *see, e.g.* Dkt. No. 206 at 4; Dkt. No. 325 at 2, 5, as well as fear of threats and retaliation should their cooperation be revealed.  *See*, *e.g.*, Dkt. No. 206 at 4; Dkt. No. 325 at 5.

(2) the cooperating witnesses as well as the Defendants and the unindicted coconspirators listed in the Indictment were *all* members of the *same* small, insular, Orthodox Jewish community, thus heightening the witnesses' concerns regarding retaliation.  *See*, *e.g.*, Dkt. No. 325 at 2.

(3) Mr. Levy was a "prominent member" of this same, singular Jewish community.  *See* Dkt. No. 325 at 2.

---

[7] It is notable that neither application provided the Court with any proof of the statements allegedly made by cooperating witnesses.  *See* Dkt. Nos. 206 and 325.  This is because, in light of the special place of trust that prosecutors occupy in our system of justice, Courts can generally rely on prosecutors to fulfill their duties with integrity.

(4) the cooperating witnesses had expressed concern for their and their families' physical safety and that revelation of their cooperation would pose significant risks to that safety. *See*, *e.g.*, Dkt. No. 325 at 2; Dkt. No. 206 at 6.

(5) that the production of the materials would reveal the cooperation of the four witnesses, thus exposing them to "ostracism and harassment." *See* Dkt. No. 206 at 4.

There is no record to support that any of these statements were true or that any of the four cooperating witnesses made the statements attributed to them. ████████████████

███████████████████████████████████████

██████████████████████; Dkt. No. 423.[8]

The Government also significantly exaggerated the statements of one cooperating witness in an effort to convince this Court to delay the disclosure of certain 3500 material.   Specifically, the Government informed this Court that one of the cooperating witnesses was "alarmed" by a conversation he had in August 2017 with a man who likely knew one or more of the Defendants' alleged, unindicted co-conspirators.  *See* Dkt. No. 325 at 4.  In describing the interaction, the Government represented to the Court that, "although this man did not tell [the cooperating witness] explicitly that he was inquiring on behalf of any of the Defendants in this case, the nature and specificity of the man's questions about cooperation during their conversation ***alarmed*** [the cooperating witness] and indicate, at a minimum, the high degree of scrutiny that [he] is under from his religious community in connection with this case."  *Id*. (emphasis added).  There is however, no evidence that this cooperating witness was "alarmed" by the conversation referenced, which took place in December 2017, nor did he make any representations regarding any scrutiny he was receiving in his religious community, let alone a "high degree" of scrutiny.  ████████████

---

[8] To extent that the Government contests the record of the witnesses' statements and contends that the cooperating witnesses did make such statements, we reiterate our request for a hearing to explore the Government's basis for such an assertion.

███████████████████████████████████████   In fact, the Government's records indicate

the opposite:  that this particular witness was so comfortable that he spoke to the individual "one or

two more times since the conversation."  *Id*. at 2.

## B.   The Government's Repeated Disregard for Court Orders.

The Government repeatedly failed to abide by multiple Orders from this Court to produce

*Brady* material.[9]  Chief Judge Irizarry first ordered the Government to review its files and produce

the *Brady* material those files contained by June 30, 2017.  *See* Ex. 4 (May 12, 2017 Conf. Tr.) at 19.

On June 30, 2017, the Government represented to the Court that it had "engaged in a review of

reports of interviews generated in the government's investigation[,]" and had also "reviewed the

[SEC's] documentation of interviews[,]" and disclosed the *Brady* material contained therein.  Dkt.

No. 164.  As described in Section 1 above, at the time the Government made that representation,

however, it was aware of significant *Brady* material that it failed to disclose as required by the

Court's Order.

This *Brady* material was of course discovered by the Defendants when they eventually

received the 3500 material, despite the multiple Court Orders to produce this material much earlier

---

[9] Notably, courts in the Second Circuit have not hesitated to sanction parties that fail to engage in good faith discovery in the civil context, pursuant to Federal Rule of Civil Procedure 37(b)(2).  *See Baba v. Japan Travel Bureau Int'l, Inc.*, 111 F.3d 2, 5 (2d Cir. 1997) (upholding district court's dismissal of plaintiff's employment discrimination claims, with prejudice, against defendant as sanctions under Rule 37(b) for her "stubborn failure to comply with the court's discovery orders"); *Urban Elec. Supply & Equip. Corp. v. New York Convention Ctr. Dev. Corp.*, 105 F.R.D. 92, 98 (E.D.N.Y. 1985) (dismissing plaintiff's action with prejudice "because of plaintiff's repeated failure to comply with the discovery orders[,]" where the court "was required to issue three written orders to compel plaintiff to comply with the prior court orders"); *Raimey v. Wright Nat'l Flood Ins. Co.*, 303 F.R.D. 17, 28-29 (E.D.N.Y. 2014) (prohibiting defendant from supporting its defenses or opposing plaintiffs' claims with any expert testimony or expert report other than that of engineer, where defendant failed to comply with court's discovery orders as engineer's "draft" report and other evidence was never produced); *Rates Tech. Inc. v. Mediatrix Telcom, Inc.*, No. CV 05-2755(JS)(AKT), 2008 U.S. Dist. LEXIS 120288, at *58-59 (E.D.N.Y. Mar. 31, 2008), *recommendation adopted by* 2011 U.S. Dist. LEXIS 34941 (E.D.N.Y. Mar. 31, 2011) (granting defendant's motion for sanctions and dismissing plaintiff's infringement claims with prejudice where plaintiff failed to adequately respond to defendant's "lynchpin" interrogatory despite numerous orders by the court to do so).

and the Government's specific representation that *Brady* material would be provided before the 3500 material disclosure.  Ex. 1 (Aug. 28, 2017 Conf. Tr.) at 29-31.[10]

### C.   The Government Made Repeated False Representations to the Court and to the Defendants.

If the foregoing were not enough, the Government also repeatedly misrepresented the scope and status of Rule 16 discovery to the Defendants and the Court.  These falsehoods were fed to the Defendants both before and after the issuance of the August 27, 2018 Protective Order.  Specifically, as early as May 12, 2017, the Government represented to Chief Judge Irizarry and the Defendants that they hoped to finish Rule 16 productions in July 2017.  *See* Ex. 4 (May 12, 2017 Conf Tr.) at 7-8.  On that same date, the Government represented that the "vast majority of discovery" had been produced, when in fact *less than half* of the Rule 16 discovery had been produced.  *Id.* at 4-5. Following the issuance of the Protective Order, and knowing that it was specifically withholding close to 270,000 pages of communications and hours of critical recordings (almost all of which is on the government's exhibit list) the Government repeatedly represented to the Defendants that there was only minor "clean up" discovery and documents received from third-parties left to be produced. *See*, *e.g.*, Ex. 15 (Oct. 17, 2017 Conf Tr.) at 16:17-18:8; Ex. 16 (Nov. 27, 2017 Conf. at Tr.) at 5:8-6:8; Ex. 17 (Apr. 29, 2018 Conf. Tr.) at 31:21-32:15; Ex. 18 (June 29, 2018 Conf. Tr.) at 12:13-13:21.  The Government even went so far as to represent that there would be no further hundred

---

[10] There is also evidence within the 3500 material of interviews conducted by the Government but not recorded.  For example, ▮▮▮▮▮, the corporate lawyer who had been hired by Black Elk for purposes of the consent solicitation – and who had given the Government *Brady* material it did not disclose to the Defendants in contradiction to the Court's Orders, *see* Section 1 above – admitted in a deposition that he had a call with the Government that is not recorded in the 3500 material.  *See* Ex. 12 (▮▮▮▮▮▮▮▮▮▮▮▮) at 3500-RSH-2 at 245-47.  Similarly, as discussed before the Court, the Government has admitted to contacting potential experts in this case which it has chosen not to call at trial. Yet the Government expects the Defendants and the Court to believe that no potentially exculpatory material was generated as a result of these conversations.  Ex. 19 (Sept. 21, 2018 Conf. Tr.) at 14-16.  There is of course no way for the defense to determine what additional exculpatory information was provided to the Government in those exchanges.

thousand page productions in this case, knowing, of course, that the deferred production clocked in

at close to 270,000 pages and contained dozens of hours of recordings.  Ex. 18 (June 29, 2018 Conf.

Tr.) at 12:13-13:21.  Just *two weeks prior* to making the deferred production, the Government falsely

represented that there were only insignificant "minimal productions left to be made."  Ex. 19 (Sept.

21, 2018 Conf. Tr.) at 17:8-18:10.[11]  These false representations left the Defendants flabbergasted

when at 11 P.M. on October 5, 2018, they received hundreds of thousands of pages of

communications and hours and hours of recordings.

Our system requires the courts and the defendants to rely on the representations made by the

government.  In its improper pursuit of strategic advantage over justice, the Government has

presented baseless factual assertions to the Court, disregarded repeated Court orders attempting to

force the Government to abide by its constitutional obligations, and lied to the Court and to the

Defendants about the quantum of evidence in this case.  In light of the repeated misconduct detailed

above, the Court and the Defendants can no longer be expected to have confidence in the

Government's conduct in this case.  This behavior cannot go unpunished.  Prosecution by any means

necessary should not be condoned by this Court.  The Indictment should thus be dismissed under the

Court's supervisory powers and the Due Process Clause of the Fifth Amendment.

## II.     ALTERNATIVELY, THE IMPROPERLY-CONCEALED WITNESSES AND MATERIALS SHOULD BE PRECLUDED

If the Court is not inclined to dismiss the Indictment at this juncture – and, respectfully, it

should – the Defendants request that the Court exercise its supervisory power over "'the

---

[11] The Government argues that the August 2017 Order did not allow them to even mention the existence of a deferred production.  *See* Ex. 2 (Oct. 29, 2018 Conf. Tr.) at 45; Dkt. No 411 at 1-2.  However, as discussed in Section 4 above, that Order allowed only two things:  (1) it allowed the Government to defer the production of certain material and (2) to keep the Order and accompanying application under seal.  *See* Dkt. No. 207.  The Order did not authorize the Government to make false statements about the status or scope of discovery.  *Id.*

**PUBLIC VERSION**

administration of criminal justice' among the parties before the bar" and suppress the materials in the deferred production, and/or preclude the witnesses who provided the materials in the deferred production as trial witnesses. *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 135 (2d Cir. 2017) (citation omitted); *id.* ("'The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.'") (citing *United States v. Hasting*, 461 U.S. 499, 505 (1983)). *See also United States v. Wedra*, 343 F. Supp. 1183, 1188 (S.D.N.Y. 1972) (constitutional violation warranted suppression of statements made by defendant during interrogation that occurred "under deceptive auspices"); *United States v. Struckman*, No. CR04-00229-RMT, 2007 WL 9701165, at *41 (W.D. Wash. Oct. 16, 2007) (excluding evidence and witnesses tainted by government misconduct).

In light of the misconduct described in detail above, we respectfully request that the Court suppress the materials contained in the deferred production and preclude the cooperating witnesses from testifying.  The Government should not be permitted to benefit from their improper behavior and it should be forced to try the case it represented to the defense existed, specifically one without 270,000 pages of communications and hours of secret recordings.

## CONCLUSION

In light of the extraordinary and inexcusable Government misconduct described above, we respectfully submit that the Court should dismiss the Indictment, or at a minimum, suppress the materials improperly withheld from the Defendants and preclude the cooperating witnesses from testifying.

Dated:  November 21, 2018             WILSON SONSINI GOODRICH & ROSATI
                                      Professional Corporation

                                      By:     /s Michael S. Sommer
                                              Michael S. Sommer
                                              Morris J. Fodeman
                                              1301 Avenue of the Americas, 40th Floor
                                              New York, New York 10019
                                              Telephone:  (212) 999-5800
                                              Facsimile:  (212) 999-5899
                                              msommer@wsgr.com
                                              mfodeman@wsgr.com

                                      *Attorneys for Defendant David Levy*


                                      By:     /s Ronald Sullivan, Jr.
                                              Ronald S. Sullivan, Jr.
                                              Counselor at Law
                                              712 H. Street, NE
                                              Suite 1354
                                              Washington, D.C. 20002
                                              Telephone:  (202) 873-9120
                                              Facsimile:  (212) 863-1459
                                              rsullivan@ronaldsullivanlaw.com

                                      *Attorney for Defendant Mark Nordlicht*


                                      FORD O'BRIEN LLP

                                      By:     /s Kevin J. O'Brien
                                              Kevin J. O'Brien
                                              575 Fifth Avenue, 17th Floor
                                              New York, New York 10017
                                              Telephone:  (212) 858-0040
                                              Facsimile:  (646) 650-2219
                                              kobrien@fordobrien.com

                                      *Attorneys for Defendant Joseph SanFilippo*

-28-