UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
      UNITED STATES OF AMERICA,

              - against –                    **ORDER**

      MARK NORDLICHT,                    16-cr-00640 (BMC)
      DAVID LEVY,
      DANIEL SMALL,
      JOSEPH MANN,
      JOSEPH SANFILIPPO, and
      JEFFREY SHULSE,

              Defendants.
---------------------------------------------------------- X

**COGAN,** District Judge.

At the close of the Government's case on June 7, 2019, defendants made, and I heard oral argument on, nine motions, including motions for acquittals under Federal Rule of Criminal Procedure 29. The parties filed supplemental letters on the Rule 29 motions, which precipitated an additional motion by defendants to preclude the Government from introducing exhibits after the fact. I disposed of some of defendants' motions in an oral ruling on June 11, 2019. This order resolves the rest of defendants' motions as follows.

    **I.**    **Defendants' Motion to Preclude the Government from Introducing Additional Exhibits**

Defendants' motion to preclude the Government from introducing additional exhibits is granted in part. The Government may admit those exhibits that are covered by the three categories of documents about which defense counsel knew and to which defense counsel agreed the Government would admit into evidence following Rule 29 arguments. But the Government may not admit anything else, because it would severely prejudice defendants to allow the Government to admit substantive documents in support of its case-in-chief after the Rule 29

motions were heard. The Government's argument that it was effectively forced to engage in Rule 29 arguments at the insistence of defense counsel and over its objection is not borne out in the record. Defense counsel certainly pushed the issue in terms of closing the record and moving straight into Rule 29 arguments on June 7, but for good reason: that is what any good defense counsel would do.

    After its last witness on June 7, the Government asked me for about a half hour break to work out with defense counsel any final exhibits it would seek to admit. That request was part of the reason why I let the jury go home for the day. The Government had at least a 15-minute break (if not longer) after the jury was excused and before Rule 29 arguments began, during which it could have conferred with defense counsel and done precisely what it said it wanted to do during a break. Just because I did not give the Government a half hour does not mean it needn't have taken advantage of the time that it did have.

    Moreover, I read the record to suggest that everyone (except, apparently, the Government) thought that the Government was formally resting on Friday "subject to those few documents, so we can hear the Rule 29." Tr. 6004:3-4. Thus, the Government must have understood (1) what defense counsel was doing by insisting that the Government formally rest its case and move into Rule 29 arguments right away and (2) that by proceeding into Rule 29 arguments, it had effectively closed the substantive record. At no point did the Government stop the proceedings, or otherwise put anyone on notice that it could not (or should not) engage in Rule 29 motion practice because it had not yet closed its substantive documentary record, or that it believed it could – contrary to common practice – admit substantive documentary evidence (the specifics of which defense counsel was not aware) after defendants argued their Rule 29 motions. The Government's failure to do so was not at my behest by hearing the Rule 29

2

motions on June 7, and I will not allow defendants to be prejudiced through a back-door attempt to bolster the record, even if it was unintentional on the part of the Government. Fundamental fairness concerns compel this outcome.

**II.     Defendants' Motions for a Judgment of Acquittal Under Rule 29**

Defendants' motions for acquittal under Rule 29 are granted in part, denied in part, and decision is reserved in part. This outcome is explained in more detail below, as to each defendant and the various theories advanced during oral argument on June 7.

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "When a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (citing United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972)).

Defendants are charged with participation in two schemes: the "Black Elk bond scheme" and the "fraudulent investment scheme." Defendants Mark Nordlicht and David Levy are charged with participation in both schemes; defendant SanFilippo is only charged with participation in the fraudulent investment scheme.

**A.  Black Elk Bond Scheme**

As to the Black Elk bond scheme, the motion for acquittal under Rule 29 is denied. The Black Elk bond scheme involves a consent solicitation in which bonds held by Platinum's affiliates – more specifically, bonds held by any person controlling or controlled by or under direct or indirect common control with Platinum – could not participate in a vote to amend a

3

bond indenture.  Black Elk reported that the amendment to the bond indenture passed.  However, according to the Government, Platinum's affiliates voted to amend the bond indenture and, if the votes by Platinum's affiliates were not counted, then the vote to amend the bond indenture would not have passed.

The parties do not appear to dispute that there were not enough votes for the amendment to pass if Black Elk did not count votes by the bonds held by Beechwood and the bonds held by entities that the parties agree are Platinum affiliates.  The parties dispute whether Beechwood was a Platinum affiliate: defendants claim it was not, but the Government claims it was.  The Government has introduced sufficient evidence for a reasonable juror to fairly conclude that Beechwood was an affiliate of Platinum, including evidence of the role of both Nordlicht and Levy at Platinum and at Beechwood.  Defendants have presented evidence to the contrary – including testimony that Nordlicht and Levy were not in charge of Beechwood and testimony that lawyers were involved in this process and did not tell them no – but it is not my role to weigh evidence on a Rule 29 motion.  See Mariani, 725 F.2d at 865.

## B.  Fraudulent Investment Scheme

As to the fraudulent investment scheme, defendants' motion for a judgment of acquittal under Rule 29 is granted as to the allegation that they overvalued level 3 assets but otherwise denied.

The indictment alleges that defendants overvalued Platinum's level 3 assets, but none of the Government's witnesses challenged the accuracy of Platinum's valuations of these assets.  The Government has not even introduced witnesses who purport to be qualified to challenge these valuations, let alone attempted to introduce expert witnesses who could have guided the jury through assessing the values of level 3 assets – which are, by definition, difficult to value.

4

Nor has the government shown that Platinum's process for obtaining these valuations is so deeply flawed that the jury can fairly infer that the valuations were false, and fraudulently so. To the contrary, the testimony has shown that Platinum hired third parties to confirm its valuations; hired an experienced director of valuations; and maintained a valuation committee. There is insufficient evidence for a reasonable juror to conclude that defendants have falsified any valuations, let alone evidence that would support defendants' conviction for fraudulently overvaluing assets.

However, there is sufficient evidence for a jury to find that defendants concealed the method by which defendants chose to redeem investors. Evidence adduced at trial shows that defendants made what the Government refers to as "preferential redemptions," i.e., redemptions based on factors such as amount invested, relationship to defendants, hardship, or litigation risk rather than the order in which the investors sought to redeem their investment. Whether defendants could make preferential redemptions (either under the law or pursuant to PPVA's governing documents) is not dispositive here. What matters is whether this information, which according to the Government's witnesses was not disclosed to investors, would have been important to PPVA investors in making an investment decision (whether that investment decision would have been to make a redemption request, change a partial redemption request into a complete redemption request, alert the SEC about PPVA's practices, or instigate litigation). This question of materiality is properly reserved for the jury. See United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015) ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination.") (internal quotation marks omitted).

The Government has also introduced sufficient evidence that defendants committed securities fraud in connection with certain promissory notes, referred to as "PPNE Notes." Platinum employees referred to these notes as "PPNE Notes" because Platinum initially intended to make a new fund, Platinum Partners Northstar Equity or "PPNE," to invest in Northstar, an oil and gas company. Platinum ultimately decided that, instead of creating a new fund, it would allow PPVA to borrow money to invest in Northstar through the PPNE Notes.

The Government adduced evidence at trial showing that defendants, through admitted co-conspirator Andrew Kaplan, informed prospective investors that Platinum would use the proceeds from the PPNE Notes to invest in Northstar. However, admitted co-conspirator Naftali Manela testified that Platinum used proceeds from these notes for its own general liquidity needs. The Government argues that this shifting purpose behind the PPNE Notes is further reflected in an email exchange involving Manela, Levy, and SanFilippo in which Levy first advised SanFilippo to inform PPVA's auditor BDO that the PPNE Notes were for "[l]iquidity to complete a transaction," but one minute later told SanFilippo that "PPNE is a general obligation of PPVA taken for liquidity." The jury may decide whether these two purposes of the PPNE Notes are inconsistent and if so, whether Platinum's representation to prospective investors about the purpose behind the PPNE Notes was fraudulent.

As to the above, there is enough evidence in the record that both Nordlicht and Levy participated in a conspiracy to defraud PPVA's investors to put the question before the jury. There was ample evidence introduced that Nordlicht communicated with investors himself about investments and redemptions, and further, that he coordinated with other co-conspirators who were investor-facing about what they should tell investors. And although Levy's role at Platinum related to finding investments rather than investors, there is enough evidence in the

6

record that he coordinated with Nordlicht and others to help develop what the investor-facing employees might tell investors, including, for example, the meeting during which Levy, Nordlicht, and their alleged co-conspirators discussed an anticipated eight percent return in April 2015.

SanFilippo also moved separately under Rule 29, in part because he appeared to play a less significant role in the alleged fraudulent investment scheme than his co-defendants, but this motion is also denied. Manela testified that in the summer of 2015, he went into SanFilippo's office and complained to him about PPVA's dire liquidity problems, that PPVA was late to pay its pending redemptions, that PPVA was paying back some hand-selected investors' redemption requests and not others, and that PPVA was not telling its investors about this practice. SanFilippo did not disagree with Manela about any of this. Rather, SanFilippo continued to make wire transfers for redemption requests that were paid out to preferred investors at Nordlicht's direction.

Construing this evidence about SanFilippo's knowledge of and participation in PPVA's practice of paying preferential redemptions in the light most favorable to the Government, the jury can fairly accept the Government's interpretation of SanFilippo's role in the company, other email communications, and conduct to further infer his participation in a conspiracy. For example, standing alone, that SanFilippo forwarded Amir Shaked's angry email asking about the status of his redemption request to Nordlicht and Levy and asked, "What are we telling this guy?" says nothing about his participation in a conspiracy. But considering the above, the jury can either choose to accept SanFilippo's argument that he is not investor-facing, so he merely forwarded this email to the proper people at PPVA, or it can accept the Government's argument that SanFilippo was in on the scheme too.

7

### C. Venue

I will defer ruling on defendants' motions for acquittal under Rule 29 for lack of venue. Defendants have raised significant issues related to venue in their letters filed on June 10 and 11 and I decline to rule on these issues until I provide the Government with a chance to respond. Within four days of the entry of this order, the Government shall submit a written response that provides the basis for venue for each count in the indictment. See United States v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011) ("The government bears the burden of proving venue . . . by a preponderance of the evidence . . . with respect to each count . . . .").

### III. Defendants' Motion for a Mistrial Based on Improper Admission of Co-Conspirator Statements

I will defer ruling on defendants' motion for a mistrial based on the improper admission of co-conspirator statements. In addition to the oral findings I made on June 11, I find that the Government has failed to make a *prima facie* showing that either Sam Salfati or Dan Weiner were co-conspirators, having not advanced any argument as to the former, and having noted only one exhibit in evidence as to the latter that is not suggestive at all of his participation in a conspiracy (because the other documents related to Weiner are excluded pursuant to my ruling above).

Defendants are instructed to file within four days of the date of this order a supplemental filing in support of their motion for a mistrial, which should include all of Salfati's and Weiner's statements that I admitted during the Government's case-in-chief under Federal Rule of Evidence 801(d)(2)(E), so that I can determine whether these statements can be stricken from the record without undue prejudice to defendants, or whether a mistrial is warranted by their admission. The Government's opposition is due three days after that.

IV. **Nordlicht's May 28, 2019 Motion *in Limine***

Finally, regarding Nordlicht's May 28, 2019 motion *in limine* to preclude evidence of certain emails labelled as "attorney-client privileged," in court on June 11, I found that these emails have little relationship to the issues in this case (i.e., the fraudulent investment scheme and the Black Elk bond scheme). I ruled that, if there were no examples of emails labelled as "attorney-client privileged" that related more directly to the issues in this case, then the emails at issue should be excluded under Federal Rule of Evidence 403. Within four days from the entry of this order, the Government shall provide me with documents that defendants labelled as "attorney-client privileged" that materially relate to the issues in this case and if none exist, then the Government should provide in the alternative a proffer of why the emails at issue are probative of defendants' guilt of the crimes charged in the indictment.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
        June 15, 2019